IN THE UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

**KENNETH R. JACKSON**,                                          Civil Case No. 09-6340-KI

               Plaintiff,

     vs.                                                                              OPINION AND ORDER

**MICHAEL J. ASTRUE**,
Commissioner of Social Security,

               Defendant.


      Kathryn Tassinari
      Drew L. Johnson, P.C.
      1700 Valley River Drive, First Floor
      Eugene, Oregon  97401

            Attorney for Plaintiff

      Dwight C. Holton
      United States Attorney
      District of Oregon


Page 1 - OPINION AND ORDER

Adrian L. Brown
Assistant United States Attorney
1000 S.W. Third Avenue, Suite 600
Portland, Oregon  97204

Jordan D. Goddard
Social Sercurity Administration
701 Fifth Avenue, Suite 2900 M/S 221A
Seattle, Washington  98104-7075

   Attorneys for Defendant

KING, Judge:

Plaintiff Kenneth Jackson brings this action pursuant to section 205(g) of the Social

Security Act, as amended, 42 U.S.C. § 405(g), to obtain judicial review of a final decision of the

Commissioner denying plaintiff's application for disability insurance benefits ("DIB") and

supplemental security income benefits ("SSI").  I affirm the decision of the Commissioner.

## BACKGROUND

Jackson filed applications for DIB and SSI on February 25, 2005.  The applications were

denied initially and upon reconsideration.  After a timely request for a hearing, Jackson,

represented by counsel, appeared and testified before an Administrative Law Judge ("ALJ") on

September 20, 2007.

On September 28, 2007, the ALJ issued a decision finding that Jackson was not disabled

within the meaning of the Act and therefore not entitled to benefits.  This decision became the

final decision of the Commissioner when the Appeals Council declined to review the decision of

the ALJ on October 9, 2009.

## DISABILITY ANALYSIS

The Social Security Act (the "Act") provides for payment of disability insurance benefits to people who have contributed to the Social Security program and who suffer from a physical or mental disability. 42 U.S.C. § 423(a)(1). In addition, under the Act, supplemental security income benefits may be available to individuals who are age 65 or over, blind, or disabled, but who do not have insured status under the Act. 42 U.S.C. § 1382(a).

The claimant must demonstrate an inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to cause death or to last for a continuous period of at least twelve months. 42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A). An individual will be determined to be disabled only if his physical or mental impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. 42 U.S.C. §§ 423(d)(2)(A) and 1382c(a)(3)(B).

The Commissioner has established a five-step sequential evaluation process for determining if a person is eligible for either DIB or SSI due to disability. The evaluation is carried out by the ALJ. The claimant has the burden of proof on the first four steps. Parra v. Astrue, 481 F.3d 742, 746 (9th Cir. 2007), cert. denied, 128 S. Ct. 1068 (2008); 20 C.F.R. §§ 404.1520 and 416.920. First, the ALJ determines whether the claimant is engaged in "substantial gainful activity." If the claimant is engaged in such activity, disability benefits are denied. Otherwise, the ALJ proceeds to step two and determines whether the claimant has a medically severe impairment or combination of impairments. A severe impairment is one "which

significantly limits [the claimant's] physical or mental ability to do basic work activities."  20 C.F.R. §§ 404.1520(c) and 416.920(c).  If the claimant does not have a severe impairment or combination of impairments, disability benefits are denied.

If the impairment is severe, the ALJ proceeds to the third step to determine whether the impairment is equivalent to one of a number of listed impairments that the Commissioner acknowledges are so severe as to preclude substantial gainful activity.  20 C.F.R. §§ 404.1520(d) and 416.920(d).  If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be disabled.  If the impairment is not one that is presumed to be disabling, the ALJ proceeds to the fourth step to determine whether the impairment prevents the claimant from performing work which the claimant performed in the past.  If the claimant is able to perform work she performed in the past, a finding of "not disabled" is made and disability benefits are denied.  20 C.F.R. §§ 404.1520(e) and 416.920(e).

If the claimant is unable to perform work performed in the past, the ALJ proceeds to the fifth and final step to determine if the claimant can perform other work in the national economy in light of his age, education, and work experience.  The burden shifts to the Commissioner to show what gainful work activities are within the claimant's capabilities.  Parra, 481 F.3d at 746. The claimant is entitled to disability benefits only if he is not able to perform other work.  20 C.F.R. §§ 404.1520(f) and 416.920(f).

## STANDARD OF REVIEW

The court must affirm a denial of benefits if the denial is supported by substantial evidence and is based on correct legal standards.  Bayliss v. Barnhart, 427 F.3d 1211, 1214 n.1 (9th Cir. 2005).  Substantial evidence is more than a "mere scintilla" of the evidence but less than

a preponderance.  Id.  "[T]he Commissioner's findings are upheld if supported by inferences reasonably drawn from the record, and if evidence exists to support more than one rational interpretation, we must defer to the Commissioner's decision."  Batson v. Comm'r of Soc. Sec. Admin., 359 F.3d 1190, 1193 (9th Cir. 2004) (internal citations omitted).

## THE ALJ'S DECISION

The ALJ found Jackson suffered from degenerative disc disease of the lumbar spine.  He did not believe, however, that Jackson's depression, psoriasis, vision impairment, hepatitis C, or tendonitis were severe impairments because Jackson did not show how any symptoms caused by those impairments affected his ability to work.  The ALJ found Jackson's depression to be situational, without imposing any limitations lasting longer than 12 months. The ALJ also found Jackson's degenerative disc disease was not severe enough to meet or medically equal the requirements of any of the impairments listed in 20 C.F.R. § 404, Subpart P, Appendix 1.

The ALJ concluded Jackson had the ability to perform light work with the option to sit or stand, and only occasional stooping, crawling, overhead reaching, or climbing ropes or scaffolds. As a result, Jackson could not perform his past work, but the ALJ believed Jackson could perform work as an optical goods worker, electronics assembler, printed products assembler, small products assembler, and small parts salvager.

## FACTS

Jackson alleges disability beginning July 11, 2003, arising from an incident at work.  He lost his balance, caught his foot and twisted his right ankle and knee as he was pulling wood out of a machine at a veneer plant.  He left for vacation on a camping trip with his family as he had planned and found that the pain began improving.  However, two days after returning to work he

began to experience pain around the lumbar spine, radiating into the right sacroiliac area and down the posterior thigh.  When plaintiff saw Gerald Barker, M.D., on July 24, 2003, Jackson reported pain and instability in his knee, and some pain in the calf and ankle.  Dr. Barker tested plaintiff and found straight leg raising was negative, but Jackson was in pain while moving his right leg back and hyper-extending his hip caused pain down the leg.  Dr. Barker diagnosed lumbar strain, with a somewhat atypical presentation, and relieved Jackson of work for three days.

When Jackson returned to Dr. Barker four days later he was slightly improved, but still felt like his back was slipping out and the pain was worse with twisting.  Dr. Barker gave him another week off work and referred him to physical therapy.

Physical therapy in August 2003 caused discomfort down his left leg.  Dr. Barker found tenderness in Jackson's lumbar area, but straight leg raising was negative except for pain radiating into the left gluteal region.  He had a fairly normal gait.  Jackson reported feeling depressed a week later, and Dr. Barker prescribed Zoloft.  Dr. Barker excused him from work for two weeks.

In late August, Jackson told Dr. Barker about a little weakness in his right knee and a feeling of giving way.  Dr. Barker found radiative pain into the right gluteal region, but negative straight leg raising and a normal gait.  Jackson remained off work another two weeks.

A lumbar x-ray showed minimal degenerative changes, including osteophytosis involving the superior and anterior end plate of L4 and T12-L1, as well as early spondylitic changes involving the vertebral body end plates.

Jackson continued to see Dr. Barker throughout 2003 and Jackson remained off work. An MRI showed a mild ventral disc bulge in the midline at L5-S1, a minimal disc bulge at L4-5, and an early minimal disc bulge at L3-4. There was no significant protrusion or spinal stenosis. Dr. Barker referred Jackson to a spine specialist.

Richard Arbeene, M.D., an orthopedic surgeon, evaluated Jackson at the request of the workers' compensation carrier in July 2003. Dr. Arbeene found Jackson exhibited considerable pain behavior–complaining about lower back pain just after being weighed on the scale, for example–and that he had a markedly antalgic gait.[1] He was unable to stand up straight and tended to list forward onto his left leg. When Dr. Arbeene compressed and retracted Jackson's head and neck, Jackson experienced lower back pain. Dr. Arbeene mentioned an emergency room evaluation in May 2003, during which Jackson complained about lower back pain, but Jackson did not remember that visit. He said that he saw Dr. Barker in 2002 for a lower back problem, but recalled his visit was primarily to address a hernia. Dr. Arbeene raised concerns that the current symptoms were merely an exacerbation of those earlier issues, commenting that Jackson was "quite vague about other aspects of that potential pre-existing history." Tr. 258. Dr. Arbeene did not feel he could make a diagnosis without those past records or current films given Jackson "markedly functional presentation today" and did not recommend any work restrictions.

---

[1]"Antalgic gait" means "[a] limp in which a phase of the gait is shortened on the injured side to alleviate the pain experienced when bearing weight on that side." The American Heritage Stedman's Medical Dictionary, http://dictionary.reference.com/browse/antalgic gait (last visited May 16, 2011).

In fact, Jackson had experienced previous back pain.  In April 2002, Jackson began experiencing back pain radiating down his right leg after lifting and carrying large wood sheets at his job.  At that time, Dr. Barker had diagnosed mechanical low back pain and sciatica.

Dr. Barker responded to Dr. Arbeene's report, noting that:

> The patient had minor insignificant back problems, it seems, prior to this injury and he seems to have significant pain and discomfort limiting his ability to walk, stand, and bend and lift and do work.  At this point, his pain and his gait abnormality are severe to the point where he is completely unable to work[.]

Tr. 290.

In November 2003, Michael E. Karasek, M.D., a neurologist and pain management physician, evaluated Jackson.  Jackson was positive for straight leg raising at five degrees on the right and ten degrees on the left, with low back pain.  Dr. Karasek did not believe Jackson was weak in the right leg, although Jackson displayed give-way weakness.  He diagnosed possible internal disc disruption ("IDD") with secondary radiculalgia.  Dr. Karasek performed an L5 transforaminal epidural steroid.  Jackson reported that the injection resolved about 50% of the pain.

Dr. Karasek performed a second injection in December 2003, which relieved about 44% of Jackson's pain.  A week later, Jackson reported that the radicular pain in the right leg was almost completely gone, but pain in the left leg had increased.  A few days later, Jackson told Dr. Karasek that he still experienced low back pain with radiation down the right leg in the L5 distribution.  Jackson had positive straight leg raising bilaterally and give-way weakness in the right leg.  Dr. Karasek recommended a surgical consultation and a referral for chronic pain management as he believed Jackson had IDD at L5-S1 with secondary L5 or S1 radiculalgia.

Page 8 - OPINION AND ORDER

A neurosurgeon named Robert Hacker, M.D., evaluated Jackson in February 2004, noting Jackson walked slowly and had limited range of motion. He found hypesthesia (abnormally decreased sensitivity) in the L5 distribution on the left. Jackson complained of low back pain, radiating into his right side, but also on the left into the thigh and calf, as well as decreased bladder/bowel control and sexual function. A subsequent MRI showed an annular fissure at the L4-5 level, unchanged from a previous study.

Dr. Barker wrote the insurance carrier in May 2004 that Jackson "will not improve and that he is permanently and completely disabled from work." Tr. 150.

Dr. Barker treated Jackson with Percocet, Neurontin, and Flexeril throughout 2004, noting stiffness, abnormal gait, weakness in the legs, and positive straight leg raising bilaterally. Dr. Barker requested a referral to a pain specialist and job retraining because he thought it "unlikely that [Jackson] will be able to [do] the kind of work that he was doing[.]" Tr. 135. The workers' compensation carrier denied the request. Dr. Barker continued to recommend that Jackson stay off work.

Kurt Brewster, M.D., an Internal Medicine Consultant, evaluated Jackson in April 2005 and found "there is evidence the claimant has chronic pain consistent with radiculopathy despite negative work up." Tr. 157. Dr. Brewster explained that the psoriasis could exacerbate joint pain. Jackson reported to Dr. Brewster he could stand eight hours per day and walk for 45 minutes a day, but Dr. Brewster thought Jackson was "overestimating his actual capacity." Tr. 158. He limited Jackson to standing and walking six hours in an eight-hour day, limited walking to no more than 30 minutes a day, and limited sitting to six hours with position changes. He limited lifting/carrying to a maximum of ten pounds, and limited Jackson to occasionally bending

at the waist, crawling, stooping and working at heights.  He thought Jackson's cane was medically necessary.

In June 2005, Jackson's counsel showed Dr. Barker a videotape, taken by Jackson's workers' compensation carrier.  In the video, Jackson moved easily, seemed to have less pain, and walked briskly with a cane and a limp.  Dr. Barker asked Jackson about the video at the July 15 visit.  Jackson explained that some days are better than others, and that he does walk.  Dr. Barker had him walk up and down the hall and noted he "walked with really quite an abnormal gait."  Tr. 214.  Dr. Barker did not believe Jackson would be able to work on a sustained basis, eight hours a day.

In July 2005, Dr. Barker diagnosed Jackson with lumbar radiculopathy based on physical examinations and spine specialist consultations.  In December 2005, Dr. Barker wrote the Social Security Administration that Jackson was "completely disabled from work" due to back pain.  Tr. 189.  In August 2006, Dr. Barker diagnosed Jackson with severe degenerative disc disease, chronic pain syndrome, and marked severe depression.  In August 2007, Dr. Barker repeated his opinion, for purposes of Jackson's disability application, that Jackson could not work an eight-hour day, and that he would miss more than two days of work per month, due to lumbrosacral disc disease.

Jackson first reported feeling depressed to Dr. Barker in August 2003, at which time he started a prescription of Zoloft.  He again reported depression to Dr. Barker in August 2004.  South Lane Mental Health evaluated Jackson for depression and anxiety in May 2005.  He described losing his house, living in a motel with his two teenage children and wife, and missing being productive.  He reported walking for recreation and doing the housework because his wife

worked.  He obsessed about his problems, including his pain, injury, and finances, and is "clearly

depressed."  Tr. 247.  He had not been depressed prior to his injury.  He was diagnosed with

major depression severe without psychosis due to a general medical condition, severe back pain.

In September 2005, Dr. Barker commented that Jackson was "definitely depressed."  Tr. 211.

At the time of the hearing, Jackson was 48 years old.

## DISCUSSION

Jackson challenges the ALJ's decision on four fronts:  he argues the ALJ erred in

evaluating his credibility; erred in evaluating Dr. Barker's opinions; erred in considering Dr.

Brewster's opinion; and failed to adequately consider Jackson's depression.

I.    Jackson's Credibility

Jackson testified he could not perform work other than his past work because he felt he

could not sit very long, stand very long, he had cramping in his leg, tendonitis kept him from

doing repetitive tasks, and he needed to lie down when he felt like it.

When deciding whether to accept the subjective symptom testimony of a claimant, the

ALJ must perform a two-stage analysis.  In the first stage, the claimant must produce objective

medical evidence of one or more impairments which could reasonably be expected to produce

some degree of symptom.  Lingenfelter v. Astrue, 504 F.3d 1028, 1036 (9th Cir. 2007).  The

claimant is not required to show that the impairment could reasonably be expected to cause the

severity of the symptom, but only to show that it could reasonably have caused some degree of

the symptom.  In the second stage of the analysis, the ALJ must assess the credibility of the

claimant's testimony regarding the severity of the symptoms.  Id.  The ALJ "must specifically

identify the testimony she or he finds not to be credible and must explain what evidence

undermines the testimony." Holohan v. Massanari, 246 F.3d 1195, 1208 (9th Cir. 2001). General

findings are insufficient to support an adverse credibility determination and the ALJ must rely on

substantial evidence. Id. "[U]nless an ALJ makes a finding of malingering based on affirmative

evidence thereof, he or she may only find an applicant not credible by making specific findings

as to credibility and stating clear and convincing reasons for each." Robbins v. Soc. Sec.

Admin., 466 F.3d 880, 883 (9th Cir. 2006).

The ALJ concluded Jackson was not entirely credible in his reports about the intensity,

persistence and effects of his symptoms. The ALJ pointed to Jackson's vagueness about a

previous back injury in the July 2003 workers' compensation proceedings, the videotape

illustrating Jackson's physical abilities, Jackson's activities of daily living, lack of objective

support for Jackson's allegations of pain, his conservative treatment, and his pain behavior.

These are all clear and convincing reasons to find Jackson's testimony somewhat unreliable.

Jackson argues that the ALJ was wrong to conclude he "conceal[ed] a prior back

complaint" in making his workers' compensation claim. Tr. 18. Jackson infers from this

statement the ALJ was referring to Dr. Arbeene's comment that Jackson had "denied a number of

prior evaluations with respect to his lower back and right lower extremity predating July 11,

2003." Tr. 258. Specifically, Dr. Arbeene asked Jackson about whether he had experienced

lower back pain prior to the July 2003 incident. Jackson "had no recollection of an emergency

room evaluation regarding these symptoms in May 2003," just two months before the July work

incident. Tr. 253. According to Dr. Arbeene, after the work injury, reference was made in the

July 2003 emergency room report of a "history of lower back pain and right sided sciatica and

left arm concerns and evaluation of these same complaints from an emergency room evaluation

in May 2003." Tr. 254. According to Dr. Arbeene, the document described the July incident as causing "increased right lower back pain (meaning that he had already experienced low back pain prior to the incident)." Id. Jackson did inform Dr. Arbeene that he had sought treatment from Dr. Barker in 2002 regarding lower back and right leg pain, "but his recollection was that he had primarily seen Dr. Barker in 2002 regarding a possible hernia problem." Id.

Jackson points out neither of the two emergency room reports–the May or July 2003–are in the record. Jackson "submits he did not misrepresent his prior back treatment." Pl.'s Opening Mem. 13. Dr. Barker treated Jackson in April 15, 2002 for "sciatica with pain radiating down his right leg." Tr. 309. At that point, Dr. Barker commented that he reviewed Jackson's emergency room records and noted that Jackson worked in a veneer plant using his back frequently. On evaluation, Jackson had "some pain in the right sciatic notch but this is not severe." Id. Jackson complained about back pain again in a visit to Dr. Barker on April 29, 2002, and again on May 13, 2002, and Dr. Barker described Jackson's back pain as "chronic." Tr. 306.

The ALJ's conclusion that Jackson's work claim was denied because he was less than candid about a previous back complaint is supported by substantial evidence in the record and is an appropriate factor to consider in a credibility evaluation. See Holohan, 246 F.3d at 1201 (if evidence supports either outcome, court may not substitute its judgment). Dr. Arbeene commented that he found Jackson's responses to his questions about previous injuries to be "vague." Tr. 254. Jackson told Dr. Arbeene he typically experienced "pain in his lower back and in his right leg at the end of his working days" before the July 2003 incident. Tr. 254. In 2002, however, Dr. Barker noted Jackson's two-month history of back pain, a previous visit to the emergency room for treatment, and characterized the pain as "chronic." Substantial evidence

Page 13 - OPINION AND ORDER

supports the ALJ's interpretation of the evidence that Jackson was not entirely forthcoming about his previous back condition.

Additionally, the ALJ noted Jackson's workers' compensation claim was denied in part because right after Jackson injured himself, and before obtaining treatment for his back pain, he went on a week-long camping trip.

With respect to the videotape, the ALJ commented that Jackson was caught "performing physical activities well in excess of his reports to his primary care physician[.]"  Tr. 18.  Dr. Barker described the video as follows:

> My impression of the video was that the patient seems to move quite a bit more freely at home than in the office.  He seems to be having less pain.  He walks rather briskly.  He does have a limp and does use his cane, but his symptoms seem quite a bit worse when he is here in the office.

Tr. 216.  It is true Dr. Barker was persuaded by a subsequent visit with Jackson during which Jackson explained he had some good days and some bad.  Jackson walked up and down the hall with an abnormal gait, but was very cooperative and willing to walk as far as Dr. Barker wanted him to.  Nevertheless, the ALJ could properly consider this evidence in a different light from the way Dr. Barker perceived it.  Just eight days before Dr. Barker watched the video, Jackson had been complaining to Dr. Barker about his "considerable pain" and his need to "increase his pain medication[.]"  Tr. 217.  The ALJ considered the video as evidence that Jackson was "performing physical activities well in excess of his reports" to Dr. Barker and this conclusion is supported by the record.  Tr. 18, see Holohan, 246 F.3d at 1201 (court may not substitute its judgment if evidence supports ALJ's conclusion).

The ALJ commented that physicians had noticed Jackson's exaggerated pain behavior.  A tendency to exaggerate symptoms is another valid reason to support a negative credibility finding.  Tonapetyan v. Halter, 242 F.3d 1144, 1148 (9th Cir. 2001).  The ALJ found Jackson's credibility suspect when he presented to Dr. Barker in August 2003 with a normal gait, but to independent medical examiner Dr. Arbeene the very next month with a markedly antalgic gait.  Dr. Arbeene believed Jackson was exaggerating his symptoms; he commented Jackson exhibited "considerable pain behavior" and was "complaining of lower back pain after simply being weighed on our scale here today."  Tr. 256.

In addition, Dr. Arbeene found that he "could not identify any muscle weakness in [Jackson's] lower extremities, but he had markedly functional response to muscle testing with give way weakness in his lower extremities."  Tr. 258.  Dr. Karasek similarly found give way weakness in Jackson's right leg, but then said, "I do not believe he is truly weak."  Tr. 277.  The MRI showed "no dramatic involvement."  Id.  Dr. Karasek recommended an epidural steroid.  Jackson takes issue with the ALJ's suggestion that "give way" weakness is an indicator of an invalid test result.  Tr. 19.  Jackson argues that it could simply mean inconsistent weakness, and results could differ based on the examiner's interpretation.  Dr. Barker seemed to think that Jackson had "shown some changes in muscle strength in different groups at different times; and, I think that this is due to some apprehension that he has in regards to certain maneuvers causing him more pain."  Tr. 143.  Despite Dr. Barker's perception of Jackson's weakness, the ALJ's reading of at least Dr. Arbeene's report as reflecting Jackson's exaggerating tendencies is supported by substantial evidence in the record.

Jackson suggests the ALJ's conclusion is contrary to the view of Dr. Brewster, who found "there is evidence the claimant has chronic pain consistent with radiculopathy despite negative work up." Tr. 157. Dr. Brewster commented that Jackson had a limp and his cane was well-used. The problem with Jackson's argument, however, is that Dr. Brewster concluded Jackson could work. He concluded Jackson could stand about six hours in an eight-hour day, could walk no more than 30 minutes a day, and could sit six hours with position changes as needed. Accordingly, the ALJ's conclusion that Jackson's "statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely credible" is not undermined by Dr. Brewster's observations.

The ALJ pointed out Jackson obtained only minimal treatment, such as pain medication, and had not been recommended for surgery. Jackson's description of the work incident as a "severe" injury was not consistent with this medical evidence. Rollins v. Massanari, 261 F.3d 853, 857 (9th Cir. 2001) (although the ALJ cannot reject subjective pain testimony solely because it was not fully corroborated by objective medical evidence, medical evidence is still a relevant factor in determining the severity of the pain and its disabling effects).

Jackson's reports of daily activities included caring for his children and grandchildren. He showed up at one appointment with the kids explaining that he had to walk to the appointment because his ride did not show up. Rollins, 261 F.3d at 857 (caring for children may be inconsistent with reports of pain). His sister wrote that Jackson had no trouble caring for himself, preparing meals, going grocery shopping, and doing the dishes and laundry.

Page 16 - OPINION AND ORDER

Finally, Jackson had not attempted to find work or vocational rehabilitation.  Jackson points out that Dr. Barker instructed him not to return to work, but Dr. Barker also specifically suggested "work retraining" for him, which Jackson never pursued. Tr. 287.

In sum, the ALJ gave clear and convincing reasons, supported by substantial evidence in the record, to find Jackson's testimony about his limitations not entitled to great weight.

II.    The ALJ's Evaluation of the Medical Evidence

Jackson challenges the way in which the ALJ dealt with the opinions of Dr. Barker and Dr. Brewster.

The weight given to the opinion of a physician depends on whether the physician is a treating physician, an examining physician, or a nonexamining physician.  More weight is given to the opinion of a treating physician because the person has a greater opportunity to know and observe the patient as an individual.  Orn v. Astrue, 495 F.3d 625, 632 (9th Cir. 2007).  If a treating or examining physician's opinion is not contradicted by another physician, the ALJ may only reject it for clear and convincing reasons.  Id. (treating physician); Widmark v. Barnhart, 454 F.3d 1063, 1067 (9th Cir. 2006) (examining physician).  Even if it is contradicted by another physician, the ALJ may not reject the opinion without providing specific and legitimate reasons supported by substantial evidence in the record.  Orn, 495 F.3d at 632; Widmark, 454 F.3d at 1066.  The opinion of a nonexamining physician, by itself, is insufficient to constitute substantial evidence to reject the opinion of a treating or examining physician.  Widmark, 454 F.3d at 1066 n.2.

Page 17 - OPINION AND ORDER

A.    Dr. Barker

The ALJ recognized that Dr. Barker believed Jackson was "totally disabled" and "unable

to sustain work activity," tr. 18, but found that these statements were not supported by objective

evidence or diagnostic studies.  The ALJ also commented on the failure of Dr. Barker to identify

Jackson's functional limitations, and his failure to reevaluate his opinions given the videotape

showing Jackson "briskly" walking.  Id.  Dr. Barker's notes also repeatedly referred to "negative"

straight leg raising and "some" tenderness, although his treatment notes do not reflect any

measurements.  Id.  The ALJ also believed Dr. Barker's report of "bilateral lower leg weakness"

was inconsistent with a later opinion of satisfactory motor strength.  Id.

Jackson asserts that Dr. Barker's opinion was based on his physical examinations,

imaging results, and the opinions of Dr. Hacker and Dr. Karasek.  As for Dr. Barker's purported

failure to provide functional limitations, Jackson argues Dr. Barker's opinion was uncontroverted

and it may only be rejected with clear and convincing reasons.

As an initial matter, Dr. Barker's opinion was not uncontroverted as examining physician

Dr. Arbeene concluded that due to Jackson's "markedly functional presentation today" he was

unwilling to "offer any specific musculoskeletal diagnoses referral to his lower back or to his

right lower extremity."  Tr. 257.  He separately opined, "I cannot identify an objective basis from

which to conclude that [Jackson] is not capable of regular work."  Tr. 259.  Accordingly, the ALJ

needed only to give specific and legitimate reasons supported by substantial evidence in the

record to find Dr. Barker's opinion unconvincing.

The ALJ rejected Dr. Barker's opinion for the reasons set forth above, and these are

specific and legitimate reasons supported by substantial evidence in the record.  See McLeod v.

Page 18 - OPINION AND ORDER

Astrue, 634 F.3d 516, 520 (9th Cir. 2011) (treating physician not qualified to offer opinion on

disability); Batson, 359 F.3d at 1195  (an ALJ is not required to accept the opinion of a

physician, even a treating physician, if the opinion is "brief, conclusory, and inadequately

supported by clinical findings"); Bayliss, 427 F.3d at 1216 (medical opinion contradicted by

notes).

       B.     Dr. Brewster

The ALJ gave "less weight" to Dr. Brewster's opinion "to the extent it is inconsistent

with [the RFC developed by the ALJ] and to the extent it is based on the claimant's animated

presentation, which is not fully supported by the objective findings." Tr. 20.  Specifically, the

ALJ found plaintiff could lift more than ten pounds and could walk more than 30 minutes a day.

Jackson complains the ALJ did not discuss Dr. Brewster's opinion that "there is evidence

the claimant has chronic pain consistent with radiculopathy despite negative work-up." Tr. 157.

Jackson had a marked limp, his cane was well-used, and Jackson's thighs were atrophied from

disuse.  Dr. Brewster specifically found Jackson to be credible. Tr. 158.  I underscore, however,

that Dr. Brewster opined Jackson could work despite these observations about Jackson's pain.

A physician's opinion may be rejected if it is "based to a large extent on a claimant's self-

reports that have been properly discounted as incredible."  Tommasetti v. Astrue, 533 F.3d 1035,

1041 (9th Cir. 2008).  As set forth above, the ALJ properly considered Jackson's credibility, and

assessed Dr. Brewster's opinion accordingly.

Furthermore, I do not see that the ALJ's opinion is affected by his statement that he

treated Dr. Brewster's opinion with "less weight."  The VE identified several jobs that complied

with Dr. Brewster's opinion as to Jackson's functional limitations, including optical goods

worker, assembler of printed products, and electronic assembly.  All three jobs offered a sit/stand

option, with the limitations on walking and weight-lifting identified by Dr. Brewster.  The ALJ

accepted the VE's testimony with respect to these jobs, which would be a representative

sampling of the work a person with Jackson's RFC could perform in the national economy.

Accordingly, if the ALJ failed to properly evaluate Dr. Brewster's opinion, which I do not

believe, such a failure was harmless.

III.    Depression

Jackson argues that the ALJ erred in his conclusion that Jackson had "situational"

depression without recognizing the severity of the disease.  Tr. 16.  The ALJ concluded that

Jackson did not demonstrate symptoms or limitations lasting or expected to last a consecutive 12

month period.

A medically determinable impairment must be established through signs, symptoms, and

medically acceptable clinical or laboratory findings but under no circumstances can be

established through symptoms, namely the individual's own perception of the impact of the

impairment, alone.  Ukolov v. Barnhart, 420 F.3d 1002, 1005 (9th Cir. 2005).  An impairment is

"medically severe" if it "significantly limits [a claimant's] physical or mental ability to do basic

work activities."  20 C.F.R. § 404.1520(c); 416.920(c).

Jackson points out that he has been complaining of depression since at least August 2004,

and he reported varying degrees of depression through September 2005; he argues this is a full

year of symptoms and that the depression is "likely affecting his ability to work."  Pl.'s Reply 8.

Jackson sought counseling over the course of several sessions from May 2005 to August

2005 and received no further counseling after that time.  Paul Rethinger, Ph.D., evaluated

Page 20 - OPINION AND ORDER

Jackson's records and concluded any depression was not severe; he found no evidence of

decompensations, no evidence that any depression limited Jackson's activities of daily living, or

affected his ability to function socially.  He found it had only mild effects on Jackson's ability to

maintain concentration, persistence or pace.  Tr. 160-172.  Bill Hennings, Ph.D., affirmed Dr.

Rethinger's opinion.  Dr. Barker never referenced any depression in discussing Jackson's back

condition in relation to Jackson's workers' compensation claim or his social security

applications.

There is substantial evidence for the ALJ to conclude that Jackson's depression did not

significantly limit his ability to work.

IV.    <u>Supplementation of the Record</u>

Finally, Jackson argues the ALJ erred in failing to develop the record regarding Jackson's

depression and that the ALJ should have ordered a psychological examination.

The ALJ must supplement the record if:  (1) there is ambiguous evidence; (2) the ALJ

finds that the record is inadequate; or (3) the ALJ relies on an expert's conclusion that the

evidence is ambiguous.  <u>Webb v. Barnhart</u>, 433 F.3d 683, 687 (9th Cir. 2005).  The

supplementation can include subpoenaing the claimant's physicians, submitting questions to the

claimant's physicians, continuing the hearing, or keeping the record open after the hearing to

allow the record to be supplemented.  <u>Tonapetyan</u>, 242 F.3d at 1150.

None of these criteria are met here.  There was no question Jackson suffered from

depression, a medically determinable impairment.  Any questions about the limiting effects on

Jackson's ability to work were answered by the available records.  The ALJ had Jackson's

counseling records, and they had been considered by Dr. Hennings, but they were insufficient to

persuade either the doctor or the ALJ that Jackson's depression imposed any functional

limitations on him.  The ALJ did not err.

V.    Vocational Hypothetical

Jackson asserts the ALJ's conclusion that Jackson can perform other work in the national

economy is not supported by substantial evidence.  According to Jackson, Dr. Barker's opinion

should be credited, and so should Jackson's own testimony that he needs to lie down for an hour

or two twice a day to relieve his pain.

The vocational expert's opinion about a claimant's residual functional capacity has no

value if the assumptions in the hypothetical are not supported by medical evidence in the record.

Magallanes v. Bowen, 881 F.2d 747, 756 (9th Cir. 1989).  However,

> [t]he ALJ is not bound to accept as true the restrictions presented in a hypothetical
> question propounded by a claimant's counsel.  Rather, the ALJ is free to accept or
> reject these restrictions . . . as long as they are supported by substantial evidence.
> This is true even where there is conflicting medical evidence.  The limitation of
> evidence in a hypothetical question is objectionable only if the assumed facts
> could not be supported by the record.

Id. at 756-57 (citations and quotations omitted).

The ALJ's limitations are supported by substantial evidence in the record and, therefore,

his conclusion that Jackson can perform other work in the national economy is not in error.


///


///

## CONCLUSION

The findings of the Commissioner are based upon substantial evidence in the record and the correct legal standards.  For these reasons, the court affirms the decision of the Commissioner.

IT IS SO ORDERED.

Dated this _____19th_____ day of May, 2011.


  /s/ Garr M. King_____
Garr M. King
United States District Judge